UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PHL VARIABLE INSURANCE COMPANY, | Case No. 10-CV-3001 (PJS/TNL) |
| Plaintiff, | |
| v. | |
| 2008 CHRISTA JOSEPH IRREVOCABLE TRUST, by and through its trustee, BNC National Bank, | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT |
| Defendant, | |
| and | |
| MIDAS LIFE SETTLEMENTS LLC, | |
| Intervenor-Defendant. | |

Thomas F.A. Hetherington, David T. McDowell, and Jarrett E. Ganer, EDISON, McDOWELL & HETHERINGTON LLP, for plaintiff.

William A. Molinski, Khai Lequang, Philipp Smaylovsky, and Silvia A. Babikian, ORRICK, HERRINGTON & SUTCLIFFE LLP; Thomas F. Nelson, LEONARD, STREET AND DEINARD, P.A., for intervenor-defendant.

Plaintiff PHL Variable Insurance Company ("PHL") filed this lawsuit against the 2008

Christa Joseph Irrevocable Trust ("the Trust"), seeking to rescind a $10 million life-insurance

policy on the basis of fraud and lack of insurable interest.  (A policy that is allegedly void for

lack of insurable interest is sometimes referred to as a "Stranger Originated Life Insurance" or

"STOLI" policy.)  The Trust never appeared in this action and is in default.  Estate Planning,

LLC, intervened as a defendant after alleging that it was the beneficial owner of the policy.  ECF

No. 6.

Shortly thereafter, Midas Life Settlements LLC ("Midas") was substituted for Estate

Planning, LLC.  ECF No. 21.  Midas later filed a counterclaim for the proceeds of the policy.

ECF No. 49.  The parties' claims were tried to the Court from June 10 through June 17, 2013.

Having heard the evidence and the arguments of counsel, the Court makes the following findings

of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).[1]

## I.  FINDINGS OF FACT

### A.  Application for and Issuance of the Policy

1.      In April 2008, PHL received an application for insurance on the life of Christa

Joseph ("Joseph") for a face amount of $10 million.  P5; Tr. 173.[2]

2.      The application originated with an insurance agency called DF Insurance Services,

Inc. ("Diverse").[3]  Cavalier Associates, LLC ("Cavalier") acted as the broker.  *See* D7 (brokerage

agreement between PHL and Cavalier); D19 (broker agreement between PHL and Diverse).

3.      Although the circumstances are somewhat murky, Joseph was originally referred

to Diverse by a man named Johann John Jean ("Jean").  Tr. 646-48.  Jean identified elderly

---

[1]After trial, PHL moved for a default judgment against the Trust, and BNC National Bank ("BNC") moved to set aside the entry of default.  BNC is the former trustee of the Trust and does not currently claim to be acting on behalf of the Trust.  As BNC is not a party and has no authority to act on behalf of a party, its motion is denied.  Having held a trial on the merits, however, the Court declines to enter a default judgment against the Trust and will instead resolve all claims on the merits and enter a "regular" judgment.  Its judgment, of course, will be binding on the Trust.

[2]Citations to trial exhibits are to "P" or "D" followed by the number of the exhibit; "Tr." indicates citations to the trial transcript.

[3]There are references in the record to an entity called "Diverse Financial."  This is either an alternate name for Diverse or a related entity also controlled by Roy Dekel (who is married to Shayna Goldburg, the producer listed on the Joseph application).  Tr. 621.  The parties seem to treat these entities as one and the same, and the Court follows suit.

people seeking insurance and referred them to Diverse, which paid Jean a commission if a policy

ultimately issued.  Tr. 644, 648.  Jean did not know Joseph; indeed, he never met or spoke with

her, but he surmises that he indirectly referred her to Diverse through a mutual acquaintance.

Tr. 645-48.

4.      The policy application lists Shayna Goldburg ("Goldburg") as the licensed

producer.  P5 at 132.  Goldburg is married to Roy Dekel ("Dekel"), one of the principals of

Diverse.  Tr. 617, 631.

5.      The policy application identified the 2008 Christa Joseph Irrevocable Trust as the

proposed policy beneficiary.  P5 at 127.

6.      In June 2008, Joseph signed the 2008 Christa Joseph Irrevocable Trust

Agreement, which established the Trust.  P42.

7.      Joseph's daughter, Helen Ramsey ("Ramsey"), is the beneficiary of the Trust.

P42 § 4.B.

8.      The express purpose of the Trust is to own life-insurance policies on Joseph's life

to be purchased at the direction of the trust protector.  P42 § 4.A.

9.      Joseph designated Jean — the same man through whom Joseph was originally

referred to Diverse — as the trust protector.  P42 § 6.A.  Joseph designated Jean as the protector

of the Trust even though, as noted, she had never met or spoken to him, and even though there is

no evidence that she knew anything about him.  Tr. 645-48.  Joseph designated BNC as the

trustee.  P42 § 5.A.

10.     The Trust is essentially controlled by the trust protector, who has substantial

authority and discretion under the Trust agreement.  The trustee, by contrast, has only

administrative responsibilities and is required to follow the directions of the trust protector.  *See* P42 §§ 5.B, 6.B, 6.C, 12.A.

11.    Doron Amir ("Amir"), another principal or agent of Diverse, asked Jean to serve as the trust protector.[4]  Tr. 645.  Jean was completely unqualified to serve as the trust protector. Jean did not know the Joseph family, and nothing about his education or experience would make him suitable to serve as protector of the Trust.  Tr. 645-46, 660.  Indeed, as discussed in more detail below, Jean does not even know what a trust protector was supposed to do and never bothered to find out.  Tr. 645-46.

12.    In his capacity as trust protector, Jean directed BNC to apply for and purchase, on behalf of the Trust, a $10 million policy insuring the life of Joseph.  P44; Tr. 658.

13.    PHL received a second application for insurance on the life of Joseph in June 2008.  P12.  This application also lists Goldburg as the licensed producer.

14.    On July 15, 2008, PHL issued a $10 million life-insurance policy ("the Policy") on the life of Joseph, naming the Trust as the beneficiary.  D136 (copy of policy from BNC's files); D139 (copy of policy from Midas's files); Tr. 1220-21.

*B. The Premium Loan and the Surrender of the Policy*

15.    The initial premium for the Policy was $318,000.  P32; Tr. 236-37, 862.

16.    The Trust borrowed the money for the premium from PFG Private Financing, LLC ("PFG Private").  P45.

---

[4]Along with Dekel, a man named Roy Amir was one of the principals of Diverse. Tr. 1008.  It is not clear to the Court whether Roy Amir and Doron Amir are different people. Assuming that they are different people, the record establishes that they are both associated with Diverse.  Tr. 645, 1008.

17.    The amount of the loan was $403,600, which included amounts to cover fees and costs, including a strikingly large $64,600 origination fee.  Tr. 846; P45 at 32.

18.    The Trust pledged the Policy as collateral for the loan.  P50.  Joseph was also required to sign a personal guaranty for 25 percent of the loan.  P49.  Joseph's personal guaranty was meaningless, as she was essentially impecunious.

19.    Shortly after making the loan, PFG Private sold the loan and assigned its interest in the Policy to PFG Loans Funding, LLC ("PFG Loans").  P54; P55; Tr. 926-27.

20.    The loan was due to be repaid, with interest, on July 23, 2010.  P45 § 2.5; P58.

21.    Joseph was diagnosed with Stage 3 endometrial cancer with metastasis in October 2008.  Tr. 1100-01.

22.    On May 10, 2010, PFG Loans sent Joseph and Jean a maturity notice.  P58.  The notice stated that a total of $403,600 in principal and $53,311 in interest would be due on July 23, 2010.  According to the letter, the Trust had two options: repay the loan or surrender the Policy entirely.  The letter did not explain that the Trust had a third option: do nothing, in which case PFG Loans would be forced to foreclose and the Trust would be entitled to any excess proceeds from the sale of the Policy.  Given that Joseph was terminally ill and the amount due on the loan was less than $500,000, the excess sale proceeds had the potential to be huge.  Included with the letter were a number of documents to be executed to effectuate the surrender of the Policy, including a "Delayed Transfer Agreement."

23.    Just two days later, on May 12, 2010, Jean signed a letter directing BNC to transfer the policy to PFG Loans.  P62.  Jean signed this letter despite the fact that Joseph was

terminally ill and the loan was not due for another two and a half months.  Tr. 664-65.  The letter

is also signed by Joseph and BNC, although these signatures are not dated.

24.     In June 2010, Joseph and Ramsey (Joseph's daughter) both signed a document

agreeing to surrender the Policy to PFG Loans.  P59.

25.     PHL filed this action against the Trust to rescind the Policy on July 14, 2010,

within the Policy's two-year contestability period.  ECF No. 1.

26.     After being served with the complaint in this case, BNC asked PFG Loans for

funds to defend this lawsuit.  D188.  BNC informed PFG Loans that if it did not receive the

necessary funds by July 30, 2010, it would resign as trustee effective August 15, 2010.

27.     PFG Loans did not advance any money to the Trust to defend this case, and BNC

resigned as trustee as of August 15, 2010.  D195.

28.     At some point, PFG Loans and BNC, ostensibly in its capacity as trustee, executed

the Delayed Transfer Agreement (a copy of which had been attached to the maturity notice that

PFG Loans sent back in May).  P68.  The document states that it was entered into as of

August 25, 2010.  If that is true — that is, if the document was indeed signed on August 25, 2010

— then it was invalid, as BNC had resigned as trustee 10 days earlier and thus no longer had

authority to act on behalf of the Trust.

29.     Under the Delayed Transfer Agreement, the Trust had an additional month in

which to pay back the loan.  The Trust agreed that it would surrender the Policy to PFG Loans if

the Trust failed to repay the loan by the due date and if Joseph was still living on that date.

Notably, neither Joseph nor the Trust had requested additional time, Tr. 900-01; instead, the

Delayed Transfer Agreement was initiated by PFG Loans as a mechanism to take possession of the entire $10 million Policy rather than merely foreclose on its security interest.

30.     The Delayed Transfer Agreement does not contain a firm closing date.  Instead, it provides that the "consummation of the transfer of the Policy . . . shall take place following satisfaction of the conditions precedent set forth in Section 3 . . . ."  P68 § 1.2.  It is undisputed that many of the conditions precedent in Section 3 were never met.  Tr. 904-10.

31.     On August 23, 2010, PFG Loans purported to sell the Policy to Estate Planning LLC.  P66.  Estate Planning LLC paid $6.4 million for the Policy — a policy that, again, the Trust had recently purported to surrender in satisfaction of less than $500,000 in debt.  A few months later, Estate Planning LLC purported to sell the Policy to Midas.  D197.

32.     Joseph died of cancer on September 15, 2011.  Tr. 967-68; D206.  Midas then filed a counterclaim for the proceeds of the Policy.

*C.  The Fraud*

33.     Both the April and the June insurance applications stated that Joseph's net worth was $11,906,000 and her "other income" was $497,000.  P5; P12.

34.     These statements were gross misrepresentations.  Joseph was a retired seamstress whose annual household income had never exceeded $40,000, and whose only valuable property was a condominium in Florida worth $169,990.  Tr. 563, 587, 323-24.  The condominium had gone into foreclosure, and toward the end of her life Joseph relied on financial help from her children to pay her utility and other bills.  P34; Tr. 591-92, 596-97.

35.     Joseph did not personally know of the misrepresentations on the insurance applications.  Joseph, who was originally from Haiti, did not speak English well.  Tr. 1056.  It is

-7-

likely that she signed at least some documents — including the Policy application — in blank. D37.

Joseph was upset to learn that PHL was seeking to rescind the Policy, Tr. 1063-64, but she nevertheless signed documents authorizing the surrender of the Policy, suggesting that she did not understand what she was signing.  There is no evidence that Joseph was aware of the potential value of the Policy, that Joseph was aware that she could sell the Policy for more than the Trust owed on the premium loan, or that Joseph was aware that she could force PFG Loans to foreclose on the Policy and pay any excess proceeds from the sale of the Policy to the Trust.  In addition, Ramsey (Joseph's daughter) did not know how much insurance had been taken out on her mother's life and was clearly shocked when informed of that amount at her deposition. Tr. 586.  Finally, there is no evidence that Joseph was paid anything to participate in the fraud. Under these circumstances, the Court finds it unlikely that Joseph knew of the misrepresentations on the insurance applications or understood much more than that a policy in some amount had been taken out on her life.

36.     An agent of Diverse — most likely Dekel working together with Amir — fraudulently inserted the false financial information into the insurance applications.

Diverse was a corrupt agency that engaged in rampant fraud.  As noted, Goldburg is listed as the licensed producer of the Policy.  Goldburg did not, however, produce the Policy.  Indeed, Goldburg has never been the licensed producer on *any* life-insurance policy.  Tr. 617.

Goldburg's signature on the April and June applications were forged by either Dekel or Amir.[5] Tr. 622-23.

Likewise, Goldburg did not author or sign the other documents that she purportedly submitted to PHL in support of the application.  Tr. 622-26.  For example, Goldburg purportedly sent a letter stating that Goldburg had known Joseph for "quite some time" and considered her a friend.  P11.  This letter is a complete fabrication; Goldburg had never met Joseph and had never seen the letter before she was deposed.  Tr. 623-24.  These other documents were forged by either Dekel or Amir.

Goldburg's authorization to solicit on behalf of PHL was itself procured through fraud. In March 2008, PHL received (and apparently approved) an application for Goldburg to become an authorized PHL agent.  P4.  Goldburg had also received similar authorizations from several other insurance companies.  D209.  But Goldburg has never sought affiliation with any life-insurance company; Goldburg's signatures on the PHL application and supporting materials were forged, most likely by Dekel or Amir.  Tr. 618-22.  Although the State of Minnesota authorized Goldburg to produce life insurance in Minnesota, P4 at 6681, Goldburg never sought such authorization, Tr. 620.

Goldburg was likely more involved in Diverse than she was willing to admit.  *See* Tr. 554-55, 980-81 (Cavalier agent's testimony that he worked with Goldburg on more than one occasion).  Indeed, based on Goldburg's demeanor during her testimony, the Court believes that she was aware of Diverse's corrupt practices.  Parts of Goldburg's sworn testimony were clearly

---

[5]Goldburg's testimony relates to the June application.  A comparison of the April and June applications reveals that the June application is the same document as the April application with some additions and alterations; in particular, Goldburg's signature is identical.  P5; P12.

false.  Whether she was lying to protect herself or instead to protect her husband ultimately makes no difference:  Either way, the procurement of the Policy was awash in fraud, and Diverse was clearly ground zero for that fraud.

As noted, Goldburg is married to Dekel, one of the principals of Diverse.  Tr. 617, 631, 1008.  Having observed the testimony of Dekel and Goldburg, the Court is convinced that Dekel was the moving force behind the fraud.  Indeed, Dekel was among the most transparently dishonest witnesses that the Court has seen.  Dekel used his wife's life-insurance license to obtain authorization from PHL to solicit life-insurance applications.  Dekel then arranged to have Joseph sign a blank application, after which he caused flagrantly false information about Joseph's net worth and income to be inserted into the application.  (As noted, the April and June applications are actually copies of the same document.)  Dekel likely worked in conjunction with Amir, who also played some role in procuring the Policy and who asked Jean to serve as the trust protector.  The Court has no doubt that Dekel and Amir acted with fraudulent intent for the purpose of inducing PHL to issue a high-value life-insurance policy that would generate a large commission for Diverse.  *See* Tr. 278 (Goldburg and Diverse were paid a $133,000 commission for the Policy).

37.    In his capacity as trust protector, Jean knowingly participated in this fraudulent scheme and knew that Diverse submitted willfully false and intentionally misleading financial information to PHL in order to obtain a high-value life-insurance policy on the life of Joseph.

Jean was essentially a grifter whose role was to refer credulous retirees to Diverse. Tr. 643-44.  Jean referred more than 20 elderly clients to Diverse, making at least $5,000 for each

referral; if he was listed as the agent on the policy, he also received a part of the commission. Tr. 634-35, 648, 650.

It is difficult to imagine a more unsuitable person to serve as a trust protector than Jean. Jean currently works as a parking valet.  Tr. 642.  Before he began selling insurance in 2006, he held a variety of what he characterized as "odd jobs," including security guard, lifeguard, and swim instructor.  Tr. 642.  Jean freely admitted that he signed whatever Diverse told him to sign, that he tossed aside documents that he did not understand, that he did not even open some of the letters sent to him in his capacity as trust protector, and that he had no idea what a trust protector was supposed to do.  Tr. 644, 646, 652, 656-57.  As for the trust document itself, Jean testified that he did not remember seeing it, but that even if he had, "I probably would not look through it because most of this stuff is jargons or it's, like, different language to me.  I probably wouldn't understand it."  Tr. 652-53.

Jean denied gathering any financial information from clients; instead, he insisted that that task was handled by Diverse.  Tr. 1071-74.  Although it may be true that Jean did not personally invent the false financial information that was included in the application for the Policy, the Court finds that Jean was well aware that he was involved in a fraudulent scheme in which Diverse submitted falsely inflated financial information to insurers in order to obtain high-value life-insurance policies on the lives of elderly people referred to Diverse by Jean.  Indeed, Jean's very attempt to deflect blame from himself only highlighted the absurdity of his story.

Jean described an incident in which he obtained financial information from the first client he ever referred to Diverse.  Tr. 1071.  Amir told him he had done it "wrong" and that he should not handle the finances.  Tr. 656.  According to Jean, Amir said that "most seniors are unaware

-11-

of what their true net worth is" and explained that it is necessary to take various "factors" into account.  Tr. 1071-72.  For this reason, Jean testified, he was supposed to leave the financials to Amir and Diverse.  Tr. 1072.  Jean spontaneously returned to this point later in his testimony, emphasizing that he never had anything to do with gathering the client's financial information and pointing out that Amir was a "CPA or something."  Tr. 1073-74.

Far from exonerating Jean, the very weakness of Amir's supposed "explanation" — as well as Jean's repeated emphasis of it, during a deposition in which he often could remember little else — strongly suggests that Jean was aware that Diverse was misrepresenting clients' financial information and that Jean was trying as hard as possible to distance himself from the fraud at his deposition.  Jean fully understood that Diverse's business model relied on premium financing to obtain life-insurance policies for elderly people.  Tr. 643-44.  Jean was also aware that these were high-value life insurance policies; as trust protector, he signed a letter directing the trustee to purchase a $10 million policy on Joseph's life.  P44; Tr. 658.  Finally, Jean was paid $5,000 per issued policy essentially for handing out Diverse's phone number, and occasionally earned a percentage of the commission on the policy; this would have clued him in to the fact that Diverse was generating very large commissions.

It is impossible to believe that Jean actually accepted Amir's transparent flimflam about seniors and their net worth, or that Jean thought that there was nothing suspicious about Amir telling him not to collect any financial information from the people he was being paid $5,000 per issued policy to refer.  Jean could not have believed that a legitimate agency seeking to place multimillion-dollar life-insurance policies would insist that an agent gather *no* financial information before referring a potential client.  Jean understood full well that he was involved in

a fraudulent scheme in which the clients' actual finances were irrelevant simply because his coconspirators would invent the necessary numbers.

The Court's conclusion is bolstered by Jean's demeanor and the general tenor of his testimony.  Jean was extremely nervous and fidgety.  He veered wildly between being overly talkative — as if to give a veneer of truth to his testimony by pretending to be forthcoming — and abruptly attempting to rein himself in when he realized that he might be on the verge of saying something damaging.  *See*, *e.g.*, Tr. 645 ("No — well, just don't want to say any more than what I'm asked"); Tr. 1074 ("I'll limit my answers to your questions.").  He inadvertently referred to his elderly clients as "target[s]," after which he quickly corrected himself.  Tr. 643.  Overall, Jean was a poor liar who was trying to figure out how to keep his story straight and himself out of trouble.

The Court's conclusion is also underscored by Jean's willingness to accept the role of trust protector at Amir's request.  Jean is not an uneducated person; he attended college for three years, and it was clear that he is both bright and savvy.  Tr. 1067.  Jean could not possibly have thought that there was anything legitimate about Amir asking him — someone who had never even met Joseph and who had no experience or expertise in working with trusts — to be the trust protector for Joseph's trust.  Jean's own behavior bears this out:  Jean never spoke to Joseph, made no attempt to find out what a trust protector is supposed to do, never bothered to read the Trust agreement, signed whatever was put in front of him by Diverse, and did not even open most of the correspondence he received from BNC because, in his words, "it just got to be a pain . . . ."  Tr. 657.  Jean's reckless behavior is strong evidence that he knew that the entire scheme was illegitimate and that the Trust, as well as his appointment as trust protector, were

shams intended to further a fraud.  Based on the evidence as a whole, the Court finds that Jean understood that he was participating with Diverse in a fraudulent scheme and that the purpose of the fraud was to obtain high-value life-insurance policies by submitting false financial information to insurance companies.

38.    The misrepresentations in the application were material to PHL's decision to issue the Policy.

PHL's financial underwriting of the Joseph policy left a lot to be desired.  It is easy in retrospect — and it should have been easy even at the time — to spot red flags and inconsistencies in the application and supporting materials.  But the Court finds credible the testimony of PHL's witnesses that PHL did not deliberately turn a blind eye to those problems in an effort to sell more insurance no matter the consequences.  To the extent PHL made underwriting decisions that now seem unreasonable, it was the result of honest mistakes, not bad faith.  Some underwriters simply do better work than others, and even the best underwriters make mistakes.  The PHL underwriting process was flawed, but it was not rigged.

Moreover, any underwriter at the time would have had trouble grasping the magnitude and audacity of the fraud that was being perpetrated against PHL.  That fraud included, among other things, the submission of false tax returns supposedly prepared by a CPA who was a real CPA but who, it turned out, had never even heard of Joseph.  Tr. 599-602.  Given the underwriting standards at the time, it was not surprising that PHL failed to detect fraud and relied on tax returns and other materials that turned out to be fraudulent.  In sum, although there is much to criticize about PHL's underwriting of the Policy, the Court finds that Joseph's financial

condition was material to PHL's decision to issue the Policy and that PHL would not have issued the Policy if it had known the truth about Joseph's financial condition.

## II.  CONCLUSIONS OF LAW

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

2.      PHL has argued that Midas does not in fact own the Policy and therefore lacks Article III standing.  The Court disagrees that the dispute over Midas's ownership of the Policy implicates the Court's Article III jurisdiction.  Midas has a colorable claim to ownership, which is all that is necessary to establish standing.  *See City of St. Louis v. Dep't of Transp.*, 936 F.2d 1528, 1532 (8th Cir. 1991) ("in the context of standing, it is the nonfrivolous claims of a party that are determinative, not whether the party can sustain those claims by proof on the merits").

3.      The parties do not dispute that Minnesota law applies to their claims.

4.      An insurance policy is voidable if it was procured through a material misrepresentation.  *Perine v. Grand Lodge A.O.U.W.*, 53 N.W. 367, 368 (Minn. 1892); *see also Mattson v. Modern Samaritans*, 98 N.W. 330, 331 (Minn. 1904).  The policy issued on the life of Joseph was procured through multiple material misrepresentations.

5.      In Minnesota, an insurer's ability to rescind a policy on the basis of misrepresentation is largely governed by statute.  This case, however, happens to fall between statutory cracks:  On the one hand, the statute that generally governs misrepresentations does not apply to life insurance.  *See* Minn. Stat. § 60A.08, subd. 9.  On the other hand, the statute that governs life insurance addresses misrepresentations as to age, physical condition, and family

history, but is silent about misrepresentations as to financial condition.[6]  *See* Minn. Stat.

§ 61A.11.  PHL's right to rescind the policy on the basis of material representations is therefore

governed by common rather than statutory law.

   The parties have not drawn the Court's attention to any differences between the statutory

standards — which themselves vary depending on the type of insurance — and the common law.

It appears to the Court, however, that under the common law PHL need not prove that the

misrepresentations were made with the intent to defraud.  *See Perine*, 53 N.W. at 368 (a material

misstatement voids the policy even if it was made honestly); *Price v. Standard Life & Accident

Ins. Co.*, 95 N.W. 1118, 1119 (Minn. 1903) (stating that the predecessor of § 60A.08 was not

intended to change the law where the matter was either material or manifestly false); *see also

Interstate Indem. Co. v. Ulven*, No. 07-4029, 2009 WL 2208213, at *5 (D. Minn. July 22, 2009)

("Insurers in Minnesota have always had the right, under the common law, to void a policy on the

basis of a misrepresentation — whether innocent or fraudulent — as long as the

misrepresentation was material.").  But this issue is academic, as the Court finds that Dekel,

Amir, and Jean acted with the intent to deceive and defraud.  In other words, even if proof of

fraudulent intent is required, PHL has provided such proof.

   The Court rejects Midas's suggestion that PHL is *also* required to prove that the

misrepresented matter — in this case, Joseph's true financial condition — increased the risk of

loss.  *See* ECF No. 176 at 27 n.5.  Midas cites no authority establishing this as a requirement

under the common law.  Even under § 60A.08, subd. 9 — which is not applicable in this case —

---

[6]There are similar statutory provisions for other types of insurance, but § 60A.08, subd. 9 and § 61A.11 (and their predecessors) are the most frequently mentioned in the cases cited by the parties.

an insurer may prove *either* intent to defraud *or* that the misrepresented matter increased the risk of loss. *See Johnson v. Nat'l Life Ins. Co.*, 144 N.W. 218, 219 (Minn. 1913) ("As we construe the statute a material misrepresentation, made with intent to deceive and defraud, avoids the policy. A material misrepresentation, not made with intent to deceive or defraud, does not avoid the policy unless by the misrepresentation the risk of loss is increased.").

*Howard v. Aid Association for Lutherans*, 272 N.W.2d 910 (Minn. 1978), is not to the contrary. True, the court stated that "[i]n general, we have held that an insurer has the option to void an insurance contract once it discovers that the insured has wilfully made a false representation which is material and which increases the contractual risk undertaken by the insurer." *Id.* at 912. But *Howard* was applying § 61A.11, which says nothing about an increased risk of loss, and *Howard* went on to define "materiality" without further discussion of the risk of loss. By contrast, the long line of cases applying § 60A.08, subd. 9 and its predecessors — which, unlike the statute at issue in *Howard*, do mention risk of loss — make clear that an insurer need prove an increased risk of loss only if it cannot prove intentional fraud. *Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917, 924 n.6 (Minn. 1983); *Preferred Risk Mut. Ins. Co. v. Anderson*, 152 N.W.2d 476, 478-79 (Minn. 1967); *Schaedler v. N.Y. Life Ins. Co.*, 276 N.W. 235, 241 (Minn. 1937); *Johnson*, 144 N.W. at 219. The overbroad statement in *Howard* should therefore not be read as setting forth the elements required for rescission.

6.      A misrepresentation is material if it substantially influenced the insurer's decision to provide coverage. *Howard v. Aid Ass'n for Lutherans*, 272 N.W.2d 910, 912-13 (Minn. 1978).

-17-

7.      Under the Policy, a statement may be used to void the Policy only if (1) it is contained in the application (or a supplemental application) and (2) a copy of the application is attached to the Policy when issued or made a part of the Policy when changes become effective. D136 § 22.

8.      PHL is entitled to rescind the Policy on the basis of multiple material, fraudulent misrepresentations.

As the Court has found, the statements concerning Joseph's net worth in the application were gross misrepresentations that were material to PHL's decision to issue the Policy.  Although the parties dispute how much of the application was attached to the Policy, there is no dispute that the pages containing the financial misrepresentations were attached, thus satisfying § 22 of the Policy.  D136; D139.  In any event, the Court finds that the entire application (as well as the policy-acceptance form) were more likely than not attached to the issued Policy, given PHL's routine practices.  *See* Fed. R. Evid. 406; Tr. 184-86.

Midas argues that PHL nevertheless cannot rescind the Policy because the misrepresentations are attributable to PHL.  *See Ser Yang v. W. S. Life Assurance Co.*, 713 F.3d 429, 433-34 (8th Cir. 2013) (under Minnesota law, an insurer is not relieved from liability on the policy when its own agent is responsible for the misrepresentations).  According to Midas, Diverse is an agent of PHL, and therefore Diverse's knowledge and actions are imputed to PHL. *See Kansel v. Minn. Farmers' Mut. Fire Ins. Ass'n*, 16 N.W. 430, 430-31 (Minn. 1883).

When the *insured* knows of the misrepresentations, however, the policy is voidable regardless of the insurance agent's knowledge.  *Bratley v. Bhd. of Am. Yeomen*, 198 N.W. 128, 131 (Minn. 1924) ("Where the insured knowingly makes false statements, he cannot recover

even though the agent participates therein.");[7] *see also Steigerwalt v. Woodhead Co.*, 244 N.W. 412, 414 (Minn. 1932) ("The rule charging the principal with his agent's knowledge is established for the protection of those who deal with the agent in good faith.  If therefore the third person acts in collusion with the agent to defraud the principal, the latter will not be chargeable with any information which the agent receives pertaining to the transaction." (citation and quotations omitted)).

As discussed above, the Court finds that Jean, the trust protector, was fully aware that Diverse would misrepresent Joseph's financial information in order to procure a high-value life-insurance policy.  Midas contends that Jean's knowledge is not attributable to Joseph or the Trust because Jean was also an agent of PHL.  But whether or not Jean was an agent of PHL for some purposes, it is clear that, *in his role as trust protector*, Jean was acting well outside the scope of any agency he may have had with PHL.

An agency relationship exists when the principal and agent agree that the agent will act for the principal and subject to his control.  *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981).  There can be no agency without the principal's consent.  *Id.* There is no evidence that PHL agreed that Jean could act on PHL's behalf in assuming the role of trust protector for the Trust.  Nor is there any evidence that PHL agreed that Diverse could act on

---

[7]*Bratley* goes on to explain that, if the agent has not only the authority to solicit and receive insurance applications, but also the unlimited authority to bind coverage, then the contract is not voidable: "the vice is eliminated because the parties ignore it and make a contract of their own choosing."  *Bratley*, 198 N.W. at 131.  Although the parties dispute whether Diverse is an agent of PHL, there is no evidence (or even claim) that Diverse had the authority to bind coverage on PHL's behalf.

PHL's behalf in controlling and directing Jean's actions as the trust protector.[8]  Moreover,

contrary to Midas's contention, it is not true that Jean's role as trust protector was limited.  As

the Court has found, Jean had virtually unlimited control and authority over the Trust — in fact,

far more control and authority than the actual trustee.  Thus, even if Jean and Diverse were both

PHL's agents for some purposes, Jean was not acting as an agent for PHL when he acted in his

role as trust protector, nor was Diverse acting as an agent of PHL when it told Jean how to act in

his role as trust protector.  *See Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325

N.W.2d 20, 28 (Minn. 1982) (attorney who was retained to negotiate sale of business acted

beyond the scope of his agency when he tried to settle employment dispute).

The question then becomes whether, in his role as trust protector, Jean's knowledge and

actions are attributable to Joseph or the Trust.  Case law regarding the role of a trust protector is

scant.  Commentators agree, however, that "[t]he trust protector is, at [his] core, an agent,"

whether of the settlor, the beneficiary, or of the trust itself.  Philip J. Ruce, *The Trustee and the*

*Trust Protector: A Question of Fiduciary Power.  Should a Trust Protector Be Held to a*

*Fiduciary Standard?*, 59 Drake L. Rev. 67, 68 (2010); *see also* Stewart E. Sterk, *Trust*

*Protectors, Agency Costs, and Fiduciary Duty*, 27 Cardozo L. Rev. 2761, 2763 (2006) ("The

trust protector, too, is only an agent."); Gregory S. Alexander, *Trust Protectors: Who Will Watch*

---

[8]The Court does not understand Midas to be claiming that Jean or Diverse had apparent authority from PHL to undertake the role of trust protector or control the trust.  In any event, there is no evidence that PHL did anything to cloak either Jean or Diverse with the apparent authority to act on PHL's behalf in acting as the trust protector or in controlling the Trust. *Hockemeyer v. Pooler*, 130 N.W.2d 367, 375 (Minn. 1964) (apparent authority must be found in the conduct of the principal, not the agent).

*the Watchmen?*, 27 Cardozo L. Rev. 2807, 2808 (2006) (suggesting that the trust protector is an agent of either the settlor or the beneficiary).

Because Minnesota law is clear that an agency cannot exist without the principal's consent, it is difficult to understand how Jean could be considered the agent of Ramsey (the beneficiary of the Trust). Ramsey had never heard of Jean and did not know that the Trust existed, much less that she was the beneficiary. Tr. 581-85. Under these circumstances, Jean must have been acting as the agent of either Joseph (who appointed him) or the Trust (which Jean essentially controlled). Either way, Jean's knowledge of and participation in the fraudulent scheme is sufficient to render the Policy voidable on the basis of fraud, given that Joseph was the settlor and named insured, the Trust was the owner and named beneficiary of the Policy, and both Joseph and the Trust signed the Policy application. P12 at 445.

It makes no difference that Jean's knowledge of the fraud may have been acquired while he was acting in some capacity other than as an agent for Joseph or the Trust:

> Knowledge of an agent acquired previous to the agency, but appearing to be actually present in his mind during the agency, and while acting for his principal in the particular transaction or matter, will, as respects such transactions or matter, be deemed notice to his principal, and will bind him as fully as if originally acquired by him.

*Lebanon Sav. Bank v. Hallenbeck*, 13 N.W. 145, 147 (Minn. 1882); *see also Schmitt v. U.S. Fid. & Guar. Co.*, 210 N.W. 846, 850 (Minn. 1926) ("if plaintiff learned of the misstatements after the policies were delivered and before his claim to indemnity arose and remained silent, he might be bound no less than if he had learned of them before the policies were delivered"). The Court has no doubt that knowledge of the fraudulent scheme was actually present in Jean's mind when

-21-

he directed the Trust to apply for the Policy.  Such knowledge is attributable to either Joseph or

the Trust (or both), and the Policy is therefore voidable.

  9.  PHL has not waived its right to seek and is not estopped from seeking rescission.

  Citing *Alwes v. Hartford Life & Accident Insurance Company*, 372 N.W.2d 376 (Minn.

Ct. App. 1985), Midas argues that because PHL failed to adequately investigate Joseph's

finances, PHL has somehow waived, or is somehow estopped from asserting, its right to rescind.

*Alwes* has nothing to do with this case, however.  To begin with, the insured in *Alwes* did not

make a fraudulent misrepresentation.  To the contrary, the insured truthfully disclosed that he

was "on disability at present."  *Id.* at 378.  The insurer ignored this information and represented

to the insured's employer (who was purchasing the group policy at issue) that the policy would

provide the same coverage as the previous policy.  *Id.*  The employer interpreted this to mean that

the same employees would continue to be covered as under the previous policy, which is what

the employer had requested.  *Id.*

  In concluding that the insurer was equitably estopped from later denying coverage, *Alwes*

stated that an "insurer's failure to inquire, when a basis for inquiry is set out on the application,

may constitute a waiver of the right to use the nondisclosure as a basis for denying coverage."  *Id.*

at 379.  But the "basis for inquiry" in *Alwes* was the insured's truthful, if cryptic, disclosure that

he was on disability.  *Alwes* does not stand for the proposition that an insurer has a general duty

to the insured to determine whether the insured has made fraudulent misrepresentations in an

application.  Moreover, even if *Alwes* can be read to impose a duty of inquiry on the insurer in a

case involving outright fraud, *Alwes* is distinguishable because here PHL did, in fact, conduct an

inquiry and, as the Court has found, that inquiry was a good-faith (if flawed) attempt to verify the financial information provided in the application.

Finally, *Alwes* makes clear that the party asserting estoppel must establish all of the elements of estoppel, including that the party detrimentally relied on a misrepresentation or nondisclosure by the insurer. *Id.* Midas does not even attempt to identify any misrepresentation or nondisclosure by PHL on which the Trust or Joseph detrimentally relied. Nor could it, given that Jean (and therefore Joseph or, alternatively, the Trust) was a knowing participant in the fraud. PHL has not waived its right to seek — and it is not estopped from seeking — rescission on the basis of misrepresentation.

10.     PHL is entitled to retain the premium paid for the Policy. *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust*, 645 F.3d 965, 969-70 (8th Cir. 2011) (holding that, if policy was procured through actual fraud of insured, insurer is not required to return premium upon rescission even where premium was funded by, and ultimately would be returned to, innocent third-party lender).

11.     Having concluded that the Policy should be rescinded on the basis of fraudulent misrepresentation, the Court declines to determine whether Midas owns the Policy or whether the Policy is void for lack of insurable interest.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     Plaintiff's motion for default judgment as to defendant 2008 Christa Joseph Irrevocable Trust [ECF No. 243] is DENIED.

2.      Non-party BNC National Bank's motion to set aside entry of default [ECF

No. 250] is DENIED.

3.      The Court DECLARES that Policy No. 97529709 issued by plaintiff and dated

July 15, 2008 is RESCINDED.

4.      Defendant Midas Life Settlements LLC shall take nothing by way of its

counterclaim.

5.      Defendant Midas Life Settlement LLC's request for attorney's fees in connection

with the motion for default judgment is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 10, 2013                         s/Patrick J. Schiltz
                                                 Patrick J. Schiltz
                                                 United States District Judge